**Charles D. NISWONGER, and Alice Niswonger, Plaintiffs/Respondents,**

v.

**FARM BUREAU TOWN & COUNTRY INSURANCE COMPANY OF MISSOURI, Defendant/Appellant.**

No. 74460.

Missouri Court of Appeals,
Eastern District,
Southern Division.

April 27, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 26, 1999.

Application for Transfer Denied
June 29, 1999.

Stephen C. Wilson, Cape Girardeau, for appellant.

Joseph P. Rice, III, Lisa K. Lang, Dickerson, Rice, Spaeth, Heisserer, Summers & Remley, L.C., Cape Girardeau, for respondents.

RICHARD B. TEITELMAN, Judge.

Defendant Farm Bureau Town & Country Insurance Company ("Farm Bureau") appeals from the trial court's grant of summary judgment in favor of plaintiffs Charles and Alice Niswonger which permitted stacking of the underinsured motorist coverages provided in each of the three separate automobile insurance policies issued to plaintiffs by Farm Bureau. On appeal, Farm Bureau contends that the relevant language of the policies clearly and unambiguously prohibits such stacking. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case was submitted to the trial court on cross-motions for summary judgment with a Joint Stipulation of Facts.

Charles and Alice Niswonger were married on July 29, 1972. On April 2, 1994, Charles Niswonger, a police officer with the City of Cape Girardeau, was providing a police motorcycle escort to a group of runners engaged in a race on city streets when he was struck by a van driven by William Joyce. Mr. Niswonger was seriously injured in the collision and required hospitalization and therapy for many weeks. His medical bills alone exceeded $300,000. His injuries and medical treatment eventually required amputation of his right leg at the hip. As a result of the injuries he sustained from the accident he is unable to return to his former employment and will require future medical care as well as the use of a wheelchair and/or prostheses for the rest of his life. Mr. Niswonger suffered total damages resulting from the collision in excess of $350,000, and his wife, plaintiff Alice Niswonger, suffered loss of consortium damages in excess of $100,000.

At the time of the accident, Charles Niswonger and his wife had three policies of automobile insurance with Farm Bureau, Nos. 578145, 578146 and 578147, each policy being on a separate vehicle the Niswongers owned. Each such policy contained a separate endorsement ("Endorsement No. 36") for underinsured motorist coverage, with liability limits of $100,000 per person and $300,000 per occurrence. The declaration pages listing the insurance coverage on each of the three insurance policies showed that plaintiffs paid a separate premium for the underinsured motorist (UIM) coverage in each separate policy. The other driver, William Joyce, had automobile liability coverage under a policy issued by his insurer with limits of $50,000 per person and $100,000 per occurrence. The Niswongers settled their claim against Joyce for his policy limits of $50,000.

After thus exhausting the underlying liability coverage of the tortfeasor, the Niswongers made demand upon their own insurance company to pay the sum of $300,000, that sum being the aggregate individual limits of the UIM coverage in their three automobile insurance policies with Farm Bureau. Farm Bureau responded by offering Niswongers $50,000 as full payment of their claims. Farm Bureau took the position that this was all it owed because (1) Farm Bureau was entitled to an offset of $50,000 against their $100,000 policy limits for the amount that the Niswongers had received from the other driver's insurer, and (2) the UIM coverages in plaintiffs' three separate policies could not be stacked. Plaintiffs contended that such an offset was improper and that the UIM coverage in their policies could be stacked.

Plaintiffs' position was based, in part, upon the language of the Farm Bureau insurance policies' Endorsement 36 pertaining to UIM coverage *as that endorsement existed prior to April 1, 1994* (hereinafter referred to for ease of reference as the "Original UIM Endorsement"). This endorsement contained the following provision under Limits of Liability:

> The limit(s) of liability stated in the declarations (Coverage A) is the maximum amount of coverage under this endorsement regardless of the number of

vehicles described in the declarations, persons insured, claims, claimants or insurance policies or vehicles involved in the accident (Conditions, Page 13, Paragraph 5).

Defendant's position, on the other hand, was based, in part, upon a version of Endorsement 36 that purportedly became effective *as of and after April 1, 1994*. The text of the original UIM Endorsement was changed by Farm Bureau in early 1994, following the decision by the Missouri Court of Appeals in *Killpack v. Farm Bureau Town and Country*, 861 S.W.2d 608 (Mo.App. W.D.1993). *Killpack* held that Endorsement 36 in the insurance policy in question was ambiguous, in such a way that Farm Bureau was not entitled to set off the amounts paid by another insurance company to an insured against monies owed by Farm Bureau to that insured under its own underinsured motorist coverage. This led to the amended version of Endorsement 36 (hereinafter referred to for ease of reference as the "Revised UIM Endorsement"). The Revised UIM Endorsement contained, among other changes, the following provision under Limits of Liability:

5. The Limit(s) of Liability set out in the declaration page, is the *maximum* amount of coverage *regardless* of the number of motor vehicles described in the declarations, person(s) insured, claims, claimants, motor vehicles involved in the accident or applicable insurance policies or bonds.

The Revised UIM Endorsement was mailed to plaintiffs by Farm Bureau along with policy renewal statements on or about March 10, 1994. Plaintiffs received the Revised UIM Endorsement and renewal statements sometime prior to the accident, which occurred on April 2, 1994. After receiving these items plaintiffs paid the renewal premiums for each of their three vehicle policies, the renewed coverage for which became effective April 1, 1994.

The notification sent by Farm Bureau to the Niswongers regarding the Revised UIM Endorsement contained the following conspicuously highlighted statement, appearing at the top of the Endorsement:

Enclosed is a copy of the new Under Insured Motorist coverage Endorsement 36. **We have revised some of the language for clarification purposes but did not change the coverage provided by the endorsement.** [emphasis added].

Please place this endorsement in your Automobile Insurance Policy Booklet. It will replace the endorsement described on page 27.

If you have any questions regarding your UIM coverage please contact your agent.

In light of the foregoing language, and based in part on their position that the Revised UIM Endorsement did not change the coverage they had prior to April 1, 1994, the Niswongers made their demand upon Farm Bureau for payment of $300,000. When Farm Bureau declined to pay that amount and the parties were unable to resolve their differences, plaintiffs filed a three-count petition against Farm Bureau. In Count I, plaintiffs sought a declaration that Farm Bureau was not entitled to offset the payment from the underlying liability coverage of the other driver against the limits of the UIM coverage provided by Farm Bureau. Plaintiffs also sought a declaration that they were entitled to stack the UIM coverages of their three policies. In Count II, plaintiffs requested that the court determine their damages. In Count III, plaintiffs stated a claim against Farm Bureau alleging fraudulent misrepresentation, based on the representation appearing at the top of the Revised UIM Endorsement that it "did not change the coverage provided" from that of the Original UIM Endorsement. The parties filed cross motions for summary judgment and stipulated as to most facts.

On April 23, 1998, the trial court entered summary judgment in plaintiffs' favor on

Counts I and II. The court first held, on the question of setoff, that Farm Bureau was not entitled to set off the recovery obtained by plaintiffs from the liability coverage of the other driver. In so ruling the court relied on *Killpack v. Town and Country Insurance Co., supra,* which had held that there was an ambiguity in Farm Bureau's policy preventing any such setoff. Here, although the language in the Revised UIM Endorsement had been changed so as to cure the ambiguity found by this Court in *Killpack,* the trial court found that the notification sent to the Niswongers appearing at the top of the Revised UIM Endorsement stated that it did not change the coverage, when in fact such coverage was changed.[1] The trial court thus concluded that plaintiffs were entitled to rely on the representation by Farm Bureau that the actual coverage had not been changed; that because Farm Bureau had represented it was not changing the UIM coverages under the policies it was now estopped from claiming otherwise; and that the Niswongers were therefore entitled to sums due under their UIM coverage without setoff for the underlying liability coverage of the other driver. The trial court then went on to hold that plaintiffs were entitled to stack the $100,000 limit of each of the three policies issued to them for a total UIM coverage of $300,000, and accordingly entered judgment for them in that amount. Plaintiffs thereafter dismissed Count III of their petition, and this appeal followed.

In its sole point on appeal,[2] Farm Bureau contends the court erred in holding that the UIM coverage on plaintiffs' three automobile insurance policies could be stacked. Farm Bureau argues that the anti-stacking language contained in both the Original UIM Endorsement, which was in effect prior to April 1, 1994, as well as the Revised UIM Endorsement, which took effect on April 1, 1994, unambiguously prohibits stacking the UIM coverage.

## STANDARD OF REVIEW

Summary judgment is appropriate where the motion and response thereto demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *ITT Commercial Finance v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). We review the factual record in the light most favorable to the party against whom summary judgment was granted.[3] *Id.* The propriety of a summary judgment is purely a question of law, and our standard of review on appeal is essentially de novo. *Id.* Summary judgment is frequently used in the context of insurance coverage questions, and the interpretation of an insurance policy is a question of law. *Lang v. Nationwide Mutual Fire Insurance Company,* 970 S.W.2d 828, 830 (Mo.App. E.D. 1998). Review of summary judgment is equivalent to review of a court-tried proceeding, and if as a matter of law the judgment is sustainable under any theory, it must be sustained. *City of Washington*

1. The coverage was changed by eliminating ambiguous language which, prior to such change, would have required the amount an insured received from a tortfeasor motorist's insurance carrier to be set off against the insured's total damages rather than against the insured's UIM policy limit *Killpack,* 861 S.W.2d at 611–612. Additionally, as will be discussed more fully *infra* in this opinion, the Revised UIM Endorsement also eliminated certain ambiguities contained in the Original UIM Endorsement that relate to the issue of stacking.

2. Farm Bureau does not appeal from the portion of the trial court's judgment concerning the setoff issue, thereby conceding that plaintiffs are, at a minimum, entitled to UIM coverage in the amount of $100,000.

3. Unlike many summary judgment motions, this one was heard by the trial court on jointly stipulated facts. In a case that is presented to a trial court on stipulated facts, the only issue on appeal is whether the court drew the proper legal conclusions from those facts. *State Farm Mutual Automobile Insurance Company v. Sommers,* 954 S.W.2d 18, 19 (Mo.App. E.D. 1997).

*v. Warren County,* 899 S.W.2d 863, 868 (Mo. banc 1995); *Jos. A. Bank Clothiers, Inc. v. Brodsky,* 950 S.W.2d 297, 300 (Mo. App. E.D.1997); *Coon v. Atchison, Topeka & Santa Fe,* 826 S.W.2d 66, 68 (Mo.App. W.D.1992).

## LEGAL DISCUSSION

Here, the trial court concluded that plaintiffs were entitled to stack their UIM coverage under any of three separate theories. Our discussion will consider each of them in order. Preliminarily, however, and for ease of discussion, we will briefly examine some of the basic legal principles of Missouri law that apply to the general subject matter of this case and controversy.

1. *Legal Principles Governing Stacking of Automobile Insurance Coverages in Missouri*

■ Insurance is a contract under which an insurer, for consideration, agrees to assume a defined risk of an insured and, upon the happening of that risk, pays the insured a sum of money. 1 COUCH ON INSURANCE 2d (Rev. ed.), § 1.2. This case deals with "stacking" of automobile insurance coverages, a matter which has over the years been, and continues to be, the source of much litigation. See generally, Burt, *A Road Map for the Stacking of Automobile Insurance Coverages in Missouri,* 50 J. Mo Bar 13 (1994). "Stacking" refers to an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle. *Tresner v. State Farm Mutual Ins. Co.,* 957 S.W.2d 380, 382 (Mo.App. W.D.1997).

■ Though similar, **un**insured motorist coverage and **under**insured motorist (UIM) coverage are not the same thing. The former refers to coverage intended to provide a source of recovery for insureds who are legally entitled to recover damages for bodily injury caused by the negligent owner or operator of a completely uninsured motor vehicle. UIM coverage, on the other hand, refers to coverage intended to provide a source of recovery for insureds (up to the insurer's liability limit for such coverage) who have been bodily injured by a negligent motorist whose own automobile liability insurance coverage is insufficient to fully pay for the injured person's actual damages. *Hopkins v. American Economy Ins. Co.,* 896 S.W.2d 933, 935 (Mo.App. W.D.1995); *Krombach v. Mayflower Ins. Co., Ltd.,* 785 S.W.2d 728, 733 (Mo.App. E.D.1990). Most often, UIM coverage takes the form of policy provisions which establish a specified total amount of monetary protection and guarantee the insured of receiving coverage for that contracted amount in the event of an accident, to the extent that the tortfeasor motorist's own liability coverage is less than the contracted amount. *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d 379, 382–83 (Mo. banc 1991). Both uninsured motorist coverage and UIM coverage are in the nature of floating, *personal* accident insurance rather than insurance on a particular *vehicle,* and thus follow the insured individual wherever he goes. Burt, *supra* at 18; see also *Gomolka v. State Automobile Insurance Company,* 15 Ohio St.3d 27, 472 N.E.2d 700, 702 (1984).

■ Statutory law in Missouri mandates that all policies of automobile insurance in this state must include uninsured motorist coverage. Section 379.203 RSMo 1994. Missouri public policy flowing from this statute requires that multiple uninsured motorist coverages *must* be allowed to be stacked, and prevents insurers from including policy language denying such stacking. *Cameron Mutual Ins. Co. v. Madden,* 533 S.W.2d 538, 544–45 (Mo. banc 1976). However, there are no statutory requirements in Missouri for *underinsured* (UIM) coverage, and no public policy requirement that UIM coverage be

stacked.[4]  *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d at 383.  Therefore, the existence of UIM coverage and its ability to be stacked are determined by the terms of the contract entered into between the insurer and insured; and in the absence of any public policy mandating UIM coverage, if the policy language is unambiguous in disallowing stacking, the courts will not create such extra coverage.  *Id.* at 383–84.  But if the policy language is ambiguous, or if it treats underinsured the same as uninsured, then courts should construe the policy in favor of the insured and allow stacking.  *Hopkins v. American Economy Ins. Co.,* 896 S.W.2d 933, 938 (Mo.App. W.D.1995).

Against this backdrop of the general law and legal principles applicable to the stacking of uninsured and underinsured motorist coverages in Missouri, we now turn our discussion to the specific case at hand.

### 2.  *The Trial Court's First Theory*

The first theory upon which the trial court found that the Niswongers were entitled to stack the UIM coverage in their three policies is that the anti-stacking language under the Original UIM Endorsement was ambiguous.  The court found it to be ambiguous in a way which would have required that the ambiguity be construed in favor of the insured so as to allow stacking if the accident had occurred prior to April 1, 1994.  Further, the court reasoned that the plaintiffs were entitled to rely on Farm Bureau's representation that the Revised UIM Endorsement contained no change in coverage from the Original UIM Endorsement, and that Farm Bureau was now estopped from asserting otherwise.  Accordingly, the trial court held that the Original UIM Endorsement was the one that applied, and that because it was ambiguous plaintiffs were entitled to stack their UIM coverage.  We agree.

On appeal, Farm Bureau begins its argument by noting, correctly, that despite some minor differences the operative "limits of liability" anti-stacking language in its Original UIM Endorsement is substantially similar to the anti-stacking language considered by our Supreme Court in *Rodriguez v. General Accident Ins. Co., supra.*  That language provided:

> The limit of liability shown in the schedule for this coverage is the maximum limit of liability for all damages resulting from any one accident.  This is the most we will pay regardless of the number of:
>
> 1.  "Insureds";
>
> 2.  Claims made;
>
> 3.  Vehicles or premiums shown in the Declarations; or
>
> 4.  Vehicles involved in the accident.

*Rodriguez,* 808 S.W.2d at 383.  As Farm Bureau points out, the court in *Rodriguez* held that the above anti-stacking language was unambiguous, and would not be overruled where no public policy required stacking and where the insurance policy did not impermissibly intertwine UIM coverage with uninsured motorist coverage.  *Id.*  Additionally, Farm Bureau urges, the insurance policy in this case also contains general anti-stacking language in the main body of the policy stated as "Condition 5," which was referenced in the Original UIM Endorsement, and which by itself plainly prohibits stacking.  That language reads:

### CONDITIONS

\* \* \*

5.  OTHER AUTOMOBILE INSURANCE IN THE COMPANY—With respect to any occurrence, accident, death or loss to which this or any other automobile insurance policy issued to the named insured or spouse by the company also applies, the total limit of the company's liability under all such policies shall not exceed the highest applica-

---

**4.**  In this respect Missouri is unlike the majority of states, which have enacted statutes requiring some form of underinsured motorist

coverage protection.  See 3 WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, § 31.5, at 8 (2d ed.1995).

ble limit of liability or benefit under any one such policy.

Farm Bureau argues that the language of Condition 5 is very clear and explicit in its intention to prohibit stacking generally, and points out that in other factual contexts the same language has been held to be unambiguous and sufficient to prevent stacking of either liability or medical payments coverages. See *Noll v. Shelter Ins. Companies*, 774 S.W.2d 147, 149 and 152 (Mo. banc 1989).

▆▆▆ Here, however, plaintiffs raise an additional alleged ambiguity, one which was not at issue in either the *Rodriguez* or *Noll* cases. Plaintiffs claim that an ambiguity entitling them to stack their UIM coverages arises from the last sentence of the "Other Insurance" clause in the Original UIM Endorsement, which also happens to be the very last sentence of that entire endorsement.[5] That clause (we have highlighted the last sentence in bold-face type for emphasis) reads as follows:

In the event there is other like or similar insurance applicable to a loss covered by this endorsement, this company shall not be liable for more than the proportion which this endorsement bears to the total of all applicable limits. **However, any insurance provided under this endorsement for a person insured while occupying a non-owned vehicle is excess of any other similar insurance.**

Plaintiffs argue that this sentence seems to say, in a very straightforward fashion, that when an insured is injured in an accident while occupying a non-owned vehicle (as Mr. Niswonger was), the underinsured motorist coverage provided by the endorsement is excess over any other applicable underinsured motorist coverage.[6] Plaintiffs contend that an average lay per-

son thus could easily construe this sentence to mean that, in a non-owned vehicle accident, the UIM coverage provided by each endorsement in each separate Farm Bureau vehicle policy issued to him was *in addition to* the UIM coverage provided by the same endorsement in his other policies. That is, a reasonable lay person could interpret the sentence to specifically *allow* stacking of UIM coverages provided in their separate vehicle policies, for which separate UIM premiums have been paid, *in the special situation where an accident occurs while the insured is occupying a non-owned vehicle.* A reasonable lay person thus could look at it and think that the policy's anti-stacking provisions, which might normally and otherwise apply, do not apply in the special situation where the insured is injured while occupying a non-owned vehicle. Therefore, plaintiffs argue, this sentence creates an ambiguity in the policy, because it conflicts with the other "anti-stacking" language of the policy.

▆▆▆ We agree. Like most litigation in the field of insurance, this case involves a dispute between an insurer and insured concerning the meaning of the policy as applied to a particular factual situation. While the UIM "anti-stacking" provisions of the policy here in question might perhaps have to be deemed unambiguous in nearly any other factual situation, that does not necessarily mean they are unambiguous in the particular factual situation now before us, where the accident occurred while Mr. Niswonger was occupying a non-owned vehicle. Just as was found to be the case in *Gulf Insurance Co. v. Noble Broadcast*, 936 S.W.2d 810, 814 (Mo. banc 1997), where the appellant's argument "appear[ed] to be persuasive initially" but then closer scrutiny revealed that ambiguous policy language could rea-

---

5. If the position or sequence of a clause creates a question concerning which preceding phrase or phrases it modifies, the choice is to be made in favor of the insured. *Hon. Almon H. Maus,* 30 Missouri Practice, *Insurance Law and Practice,* § 1.15 at 36–37 (1997).

6. Moreover, there is no question that the term "similar insurance" as used in this clause does, in fact, refer to "other underinsured motorist insurance coverages." 3 WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE, § 40.1, at 238 (2 ed.1985).

sonably be construed as *superseding* certain other policy provisions which would normally and otherwise apply, so here too, the last sentence of the Other Insurance clause in the Original UIM Endorsement could be so construed by the insured. Further, the fact that the sentence begins with the word "However" suggests, and could easily be interpreted by a lay person to mean, that it *prevails and takes precedence over* the policy's prior anti-stacking language whenever the accident is one where the insured was occupying a non-owned vehicle.[7] Thus, to the extent that that sentence seems to conflict with the policy's prior anti-stacking language, it not only creates an ambiguity in the policy, but a reasonable lay person might well look at it and think the way the conflict is resolved is that the sentence overrides such prior conflicting language.

■■■ Whether an insurance policy is ambiguous is a question of law. *Gulf Insurance Co. v. Noble Broadcast,* 936 S.W.2d at 813. Courts may not create an ambiguity to distort the language of an unambiguous policy. *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d at 382. But when provisions of an insurance policy are ambiguous, they are construed against the insurer. *Krombach v. Mayflower Ins. Co., Ltd.,* 827 S.W.2d 208, 210 (Mo. banc 1992). An ambiguity arises when there is duplicity, indistinctness or uncertainty in the meaning of the words used in the policy. *Id.* Language is ambiguous if "it is reasonably open to different constructions," and, in determining whether that is the case, "the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." *Id.* When there is an ambiguity, insureds are entitled to a reso-

lution of that ambiguity consistent with their objective and reasonable expectations as to what coverage would be provided. *Zemelman v. Equity Mutual Ins. Co.,* 935 S.W.2d 673, 675 (Mo.App. W.D.1996).

Farm Bureau would urge us to believe that the real intent of the excess clause in the Original UIM Endorsement is clear enough; and that it is generally well understood by judges, lawyers and insurers, in situations such as this one where the insured is injured while occupying a non-owned vehicle, merely to mean that the insured's UIM coverage is excess to any third party UIM coverage on the non-owned vehicle that may be available as a source of recovery for injured occupants—i.e., that the third party's UIM coverage is not set off against the insured's own UIM coverage. And indeed, that may well be the general understanding among those so schooled in the intricacies of insurance law. See 3 WIDISS, *supra,* § 40.1 at 239. It is thus susceptible to more than one meaning.

■■■ But this argument overlooks the fact that the existence or non-existence of ambiguity in an insurance contract is not to be measured from the standpoint of one who has great expertise in the special terminology and intricacies of insurance law. Rather, the language is to be viewed in the light that would ordinarily be understood by the layman who bought and paid for the policy. *Krombach,* at 210. Words in an insurance contract are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean, but rather what a reasonable layperson in the position of the insured would have thought they meant. *Wood v. American Family Mutual Insurance Co.,* 148 Wis.2d 639, 436

---

7. The word "however" in a contract is a word of exclusion, indicating an alternative intention, a contrast with a previous clause and a modification of it under other circumstances. *Preston v. Herminghaus,* 211 Cal. 1, 292 P. 953, 957 (1930). "However" is commonly understood to be synonymous with words and expressions such as "notwithstanding," "in all events," and "in any case, nevertheless." *Texas Electric Railway Co. v. Neale,* 244 S.W.2d 329, 333 (Tex.Civ.App.1951). These meanings are supported by reference to the dictionary, as indicated in *Chicago, Rock Island & Pacific Railroad Co. v. Hughes,* 250 Ark. 526, 467 S.W.2d 150, 153 (1971).

N.W.2d 594, 599 (Wis.1989). We thus cannot assume that the language here at issue should be held to be unambiguous merely because it may be apparent that the insured's proffered interpretation is not what *insurer* intended the language to mean. As both this court and our Supreme Court have said, in quoting Judge Learned Hand and speaking with approval of "the canon *contra proferentum*,"[8] that canon "is more rigorously applied in insurance than in other contracts, in recognition of the difference between the parties in their acquaintance with the subject matter." *Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d at 211; *American Economy Ins. Co. v. Cornejo*, 866 S.W.2d 174, 177 (Mo.App. E.D.1993). "Insurers who seek to impose upon words of common speech an esoteric significance intelligible only to their craft, must bear the burden of any resulting confusion." *Id.*

We do recognize that an ambiguity argument similar to the one raised here by the plaintiffs was rejected by the Western District of this Court, in the case of *Farm Bureau Town and Country v. Hughes*, 629 S.W.2d 595 (Mo.App. W.D.1981). In *Hughes*, a mother, father and son were insured under three separate automobile insurance policies on their three vehicles. The son was injured while riding as a passenger in a non-owned vehicle. The policies in *Hughes* contained general anti-stacking language identical to that of "Condition 5" of the policies in this case. Plaintiffs in *Hughes* sought to stack the medical payments coverages of their three policies. Their position was based in part on the following excess clause of an Other Insurance provision somewhat similar to the one at issue in the instant case: "provided, however, the insurance afforded under Coverage C of this policy with respect to a temporary substitute or non-owned automobile shall be excess insurance over any other valid and collectible automobile

insurance affording benefits for medical expenses." *Hughes*, at 597–98. In construing that clause, the court in *Hughes* held that the reference to "other valid and collectible automobile insurance" was not intended to apply to the insured's other two vehicle policies with Farm Bureau, stating: "Clearly, the excess insurance provision applies to insurance provided by a third policy on an automobile not owned by the injured person, and not to policies in the same company, as specified by Condition 5." *Id.* at 598. The court in *Hughes* thus found the excess clause at issue there was not ambiguous, and accordingly held that plaintiffs were not entitled to stack the medical payments coverages on their three separate vehicle policies.

We find *Hughes* to be both distinguishable and not compelling.

First, the holding on this point in *Hughes* is distinguishable in at least one significant respect. The clause there at issue referred very broadly and generally to "any other *valid and collectible* insurance." (emphasis added) In contrast, the clause here at issue refers specifically to "any other *similar* insurance." (emphasis added) Since the implication of the "similar insurance" language to a layperson would be that the Original UIM Endorsement, in the event of an injury while occupying a non-owned vehicle, provides such coverage in addition to any other applicable *underinsured motorist coverage*, this might more readily be perceived by a reasonable layperson as presenting a specific conflict with the policy's previous anti-stacking language and thus creating an ambiguity, when compared to the language of *Hughes*. Second, we do not find *Hughes* persuasive, and respectfully disagree with it. The court in *Hughes* reached the conclusion that it did on this point without any analysis or explanation of its reasoning, apparently assuming that the proposition

---

**8.** "Contra proferentum" is a rule of construction used in connection with the interpretation of written documents; it holds that an ambiguous provision is to be construed most

strongly against the party who selected the language. BLACK'S LAW DICTIONARY (Sixth ed.1991), at 327.

it found "clearly" to be true was self-evident. It isn't.[9]

Aside from the above-noted problems with *Hughes,* we also note that the "limit(s) of liability" language in the Original UIM Endorsement refers, confusingly, to "Coverage A" as stated on the declarations page. Yet the declarations pages of the policies indicate that "Coverage A" is bodily injury liability, and not underinsured motorist coverage, which is listed on the declarations pages as "Coverage D." While it is true that the amounts of these coverages ("A" and "D") are the same, ($100,000 per person/$300,000 per occurrence), the fact nonetheless remains that the Original UIM Endorsement seeks to impose anti-stacking limitations that expressly do *not* refer to uninsured/underinsured "Coverage D," but rather and only to "Coverage A." Because they expressly refer only to "Coverage A," they arguably do not refer at all to "Coverage D." Should a reasonable layperson be expected to sift through such misreference and confusion, caused by the insurer's own drafting, and yet still be expected to understand that the policy prohibits stacking of UIM coverages? We think not. This is the type of muddled policy language that should be deemed ambiguous because it "could confuse the average lay person" and leave that person with a misleading impression as to coverage. *Krenski v. Aubuchon,* 841 S.W.2d 721, 730 (Mo.App. E.D.1992).

We find that the last sentence of the Original UIM Endorsement creates a genuine ambiguity in this case, because from the perspective of an average lay person that sentence, when read in conjunction with the policy as a whole, could be interpreted as superseding the anti-stacking provisions which might normally and otherwise apply. The policy does not make it unambiguously clear that that sentence applies only to potentially available UIM coverage that might be issued by *other* insurance companies, rather than to UIM coverage available to the insured through his own separate vehicle policies with Farm Bureau. The additional murkiness created by the Original UIM Endorsement's confusing reference to "Coverage A" rather than "Coverage D" only compounds the problem, and is yet another difference between this case and *Hughes.* We therefore hold that the trial court was correct in concluding that the Original UIM Endorsement had ambiguities which would have required it to be construed in favor of allowing stacking, had the accident in question occurred prior to April 1, 1994.

■ The trial court was also correct in determining that the Original UIM Endorsement applies under the facts of this case. When Farm Bureau represented to the Niswongers that the Revised UIM Endorsement contained no change in coverage from the Original UIM Endorsement, they were entitled to rely on that representation. A reasonable consumer would be entitled to believe "no change" means "no change;" and hence, even if he or she had carefully read the endorsement before and would ordinarily carefully study any amended endorsement, would see no need to do so in the face of such a misleading representation. Farm Bureau is thus estopped from asserting otherwise and relying on any purported change in the terms of coverage under the Revised UIM Endorsement. See *Brown v. State Farm Mutual Automobile Ins. Co.,* 776 S.W.2d 384, 388 (Mo. banc 1989); *Rooks v. Lincoln County Farmers Fire Ins.,* 830 S.W.2d 507, 511 (Mo.App. E.D.1992). Further, an insurance policy is not issued in a vacuum but rather under a given set of factual circumstances, and "what at first blush might appear unambiguous in the

9. As the venerable author and esteemed Professor Emeritus at Saint Louis University School of Law, Gerald T. Dunne, has on occasion commented to his students over the years, one should always be skeptical whenever the proponent of a proposition seeks to justify it by asserting that its truth is self-evident. This often is a sign that there is little or nothing else to support the proposition's purported validity.

insurance contract might not be such in the particular factual setting in which the contract was issued." *Kaufmann v. Economy Fire & Casualty Co.,* 76 Ill.2d 11, 27 Ill.Dec. 742, 389 N.E.2d 1150, 1152–53 (1979). Here, Farm Bureau's representation to the Niswongers that there had been no change in coverage from that provided in the Original UIM Endorsement is an inextricable part of the factual setting under which the Revised UIM Endorsement was purportedly issued.

Accordingly, as we have determined that the Original UIM Endorsement is the one that applies under the facts and circumstances of this case, and that that Endorsement is ambiguous in a way which requires that stacking be allowed, we hold that plaintiffs were entitled to stack the UIM coverage under their three separate vehicle policies issued by Farm Bureau.

### 3. The Trial Court's Second Theory

The second theory upon which the trial court relied in finding that plaintiffs were entitled to stack the UIM coverage under their three separate policies is that, even if it is the language of the Revised UIM Endorsement rather than the Original UIM Endorsement that governs in this case, the "attempted change in language leaves the policies no less, and perhaps even more, ambiguous than before." Since we have already determined that the Original UIM Endorsement is the one that applies in the given situation, we need not discuss at length this second theory. We nonetheless note that it lacks merit.

### 4. The Trial Court's Third Theory

The final theory upon which the trial court relied in holding that plaintiffs were entitled to stack their policies' UIM coverage had to do with the fact that the policies Farm Bureau issued to plaintiffs arguably treated uninsured motorist coverage and underinsured motorist coverage the same, because both are lumped together on the declarations page as "Coverage D," with plaintiffs being charged a single premium for both coverages.

Stacking is allowed if the policy language is ambiguous, *or* if it treats UIM coverage the same as uninsured motorist coverage. *Hopkins v. American Economy Ins. Co.,* 896 S.W.2d 933, 938 (Mo.App. W.D.1995). Regarding whether a policy of insurance is deemed to treat UIM and uninsured coverage the same, our Supreme Court has stated that if an insurer in effect "lumps apples and oranges together" and calls the entire class apples, the courts will treat it as such. *Krombach v. Mayflower Ins. Co., Ltd.,* 827 S.W.2d 208, 212 (Mo. banc 1992). As the Supreme Court there went on to state: "The same public policy that invalidates anti-stacking provisions of uninsured motorist coverage is equally applicable to underinsured motorist coverage if the two are treated as the same in the insurance contract. The preparer of the insurance contract may not collect premiums for mandated insurance coverage and then by anti-stacking provisions deny multiple coverage." *Id.* See also *American Economy Ins. Co. v. Cornejo,* 866 S.W.2d 174, 177 (Mo.App. E.D. 1993).

Thus, "if there is a combination or tying together of the uninsured motorist and underinsured motorist coverage," our courts have required stacking of the UIM coverage as well as the uninsured motorist coverage. *Lang v. Nationwide Mutual Fire Insurance Company,* 970 S.W.2d 828, 834 (Mo.App. E.D.1998). The question here is whether there has been such a combination or "tying together" of uninsured and underinsured motorist coverage, as will require that stacking of UIM coverage be allowed. We conclude that there has been.

In this case, although it is true that the body of the policy does separate out uninsured and underinsured coverage, treating and defining them differently, it also appears, as the trial court found, that the declarations pages of the three policies lump the two coverages together as one coverage denominated "Coverage D," and

the Niswongers were charged a single premium for that coverage.[10] The trial court reasoned that this could have misled the Niswongers into believing that in order to purchase the one type of coverage they had to purchase the other as well. And because plaintiffs would be required to pay the premium in order to have the mandatory uninsured motorist coverage, it is not illogical to assume that by charging a single premium for both types of coverage Farm Bureau was, in effect, requiring the Niswongers to purchase underinsured motorist coverage. Yet our Supreme Court has stated: "The preparer of the insurance contract may not collect premiums for mandated coverage and then, by anti-stacking provisions, deny multiple coverage." *Krombach*, 827 S.W.2d at 212. We conclude that such an absence of clear demarcation between uninsured and underinsured coverage on the declarations pages, lumping the two together and charging a single premium for both, is a form of intertwining the two coverages that is ambiguous. Further, we think that in the face of such an ambiguity, the insureds are entitled to have the dispute resolved consistent with fulfillment of their objective and reasonable expectations of coverage.[11] The "reasonable expectations" doctrine has been described as follows:

> The principle of reasonable expectations insures that " '[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated

those expectations.' R. Keeton, Basic Text on Insurance Law, § 6.3(a), at 351 (1971)."

*Tegtmeyer v. Snellen*, 791 S.W.2d 737, 740 (Mo.App. W.D.1990); *Husch v. Nationwide Mutual Fire ins. Co.*, 772 S.W.2d 692, 694 (Mo.App. E.D.1989); *Linderer v. Royal Globe Ins. Co.*, 597 S.W.2d 656, 661 (Mo.App. E.D.1980). See also generally, Pitcher, *Insured's "Reasonable Expectations" As To Coverage Of Insurance Policy*, 20 POF2d 59. The doctrine of reasonable expectations is not in strict accordance with traditional principles of contract interpretation. *Ward v. American Family Ins. Co.*, 783 S.W.2d 921, 923 (Mo.App. E.D.1989). It therefore should be invoked by courts only with caution, in instances where its application may seem particularly appropriate. Our Supreme Court has suggested, however, that application of the doctrine may be appropriate in disputes where there is an ambiguity in the policy. *Rodriguez v. General Accident Ins. Co.*, 808 S.W.2d at 382.

This is such an instance. Here, there was an ambiguity in the policy, one that could lead a reasonable lay person to believe that stacking of UIM coverages on their separate policies was allowed, at least in those cases where the accident occurred while the insured was occupying a non-owned vehicle. The fact that Farm Bureau combined uninsured and underinsured coverage together on the declarations pages, and thereby in effect treated

---

**10.** It is evident from the record that although the trial court referred to them as "summary sheets," these were in fact the actual declaration pages issued to the Niswongers for the relevant time period. Farm Bureau never claimed otherwise in any responsive pleading. Although Farm Bureau initially contended in its brief on appeal that the "actual" declarations pages supplied to plaintiffs were in a different form, one that did plainly separate out UM/UIM coverage and show a separate premium for each, counsel for Farm Bureau conceded at oral argument that this contention was incorrect.

**11.** In this regard, we have little doubt as to the objective and reasonable expectations of the average lay person/insurance purchaser, especially given that UIM coverage is in the nature of personal accident insurance. When a consumer purchases three separate automobile policies from an insurer, each providing $100,000 of UIM coverage, and pays a separate premium for each, does he reasonably contemplate that the coverage he thereby obtains will be the same as if he had paid only one premium for UIM coverage on only one of his vehicles?

them as the same, creates still a further ambiguity.

Some might cite *Rodriguez* as support for the proposition that there is no ambiguous combination or tying together of uninsured and UIM coverage, as to invalidate UIM anti-stacking provisions in a policy, when the main body of the insurance policy itself clearly defines and treats the two coverages differently. Therefore, they would argue,. the mere fact that plaintiffs here may have paid a single premium for their UIM and uninsured coverage, which were lumped together and listed on the declarations page as one coverage, is not sufficient to create such an ambiguity. But *Rodriguez* did not occur, as did this case, in the factual context of a declarations page that puts the two coverages together in this manner. And in other cases, where we have considered the question of whether "apples and oranges" have been mixed such that there has been an impermissible tying together of uninsured/underinsured coverage, we have suggested that the presence of separately stated coverages with separately stated premiums shown on the declarations page *is* a significant factor——when such separation exists, and thus tends to support the view that there has been no lumping together. *Lang v. Nationwide Mutual Insurance Company,* 970 S.W.2d 828, 834 (Mo.App.E.D.1998). If it's a significant factor when it cuts one way, it should also be considered a significant factor when it cuts the other way.

The trial court was correct in concluding that stacking was permitted because Farm Bureau impermissibly intertwined uninsured and underinsured coverage. This is a situation where the insurer has created expectations of coverage on the part of the insured, in part by the use of language in the declarations page which bundles both coverages together as one "Coverage D" with a single premium being charged for both, but then attempts to contradict those reasonable expectations by the boilerplate language used in the Original UIM En-

dorsement——language which was *itself* ambiguous on the issue of stacking.

## CONCLUSION

The judgment of the trial court is affirmed.

ROBERT G. DOWD, Jr., C.J., concurs.

KATHIANNE KNAUP CRANE, J., dissents in separate opinion.

KATHIANNE KNAUP CRANE, Judge.

I respectfully dissent. The Supreme Court as well as the Western District has held that the language contained in Condition 5 of this policy is not ambiguous and precludes stacking of coverage under several policies issued to the insured by the same insurer. *Noll v. Shelter Ins. Companies,* 774 S.W.2d 147, 152 (Mo. banc 1989); *Farm Bureau Town & Country v. Hughes,* 629 S.W.2d 595, 598 (Mo.App.1982). Further, this policy does not intertwine "uninsured" and "underinsured" coverage and does not create an ambiguity in that respect. The policy clearly defines the term "underinsured" as separate and apart from the term "uninsured." *Rodriguez v. General Accident Ins. Co.,* 808 S.W.2d 379, 383–84 (Mo. banc 1991); *Lang v. Nationwide Mut. Fire Ins. Co.,* 970 S.W.2d 828, 834 (Mo.App.1998). The UIM coverage is contained in an endorsement separate from the uninsured motorist section of the policy. *See Lang,* 970 S.W.2d at 834.

The last sentence, or "excess" clause, of the "Other Insurance" provision of the Original UIM Endorsement does not create an ambiguity which invalidates or supercedes Condition 5's clear prohibition against stacking. *Hughes,* 629 S.W.2d at 598. The Other Insurance provision of the Original UIM Endorsement limits Farm Bureau's UIM liability in proportion to other insurance applicable to a loss except in the situation in which the insured is occupying a non-owned vehicle, in which case Farm Bureau's UIM coverage is excess to other UIM insurance. *See* 3 Wid-

iss, Uɴɪɴsᴜʀᴇᴅ ᴀɴᴅ Uɴᴅᴇʀɪɴsᴜʀᴇᴅ Mᴏᴛᴏʀɪsᴛ Cᴏᴠᴇʀᴀɢᴇ Section 40.1, at 239. Because Condition 5 prohibits stacking of coverage under other policies issued to plaintiffs by Farm Bureau, the "excess" clause of the Other Insurance provision cannot extend to those policies. As a result, "the excess insurance provision applies to insurance provided by a third party on an automobile not owned by the injured person, and not to policies in the same company, as specified by Condition 5." *Hughes,* 629 S.W.2d at 598.

I would reverse that part of the judgment allowing stacking.